MARK WINDSOR (Bar No. 190589)
65 N. Raymond Avenue, Suite 320
Pasadena, California 91103
Telephone: (626) 792-6700
Facsimile: (626) 956-8900
Email: mark@windsorlaw.us

Attorney for Defendant
JUAN RAMON MATTA-LOPEZ

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUAN RAMON MATTA-LOPEZ<br><br>Defendants. | Case Nos. 85-cr-00606-PAR, 88-cr-00129-WJR<br><br>**MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A) ; EXHIBITS** |

Defendant Juan Ramon Matta-Lopez, by and through his counsel of record, Mark Windsor, respectfully moves this Court to grant his motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), and order his immediate release. This motion should be granted due to the "extraordinary and compelling reasons" confronting the federal prison system by the pandemic of COVID-19 and the fact that Mr. Matta-Lopez, at age 75, is not a danger to the community, suffers from serious medical issues; and further because respect for the law and general deterrence, other notable Section 3553(a) factors, would not be undermined by ordering his release given the cataclysmic events of the current pandemic and the lengthy sentence he has already served. We respectfully ask the Court to consider this motion on an expedited basis as each day in

1

1  custody brings renewed and unthinkable risk to Mr. Matta-Lopez's life.

2

3  Dated: April 3, 2020                    Respectfully submitted,

4

5                                          /s/ *Mark Windsor*

6                                          MARK WINDSOR, Counsel for
                                           JUAN RAMON MATTA-LOPEZ

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iii

BACKGROUND ..................................................................... 1

ARGUMENT ......................................................................... 2

    I.     THIS COURT HAS AUTHORITY TO RESENTENCE MR. MATTA-
           LOPEZ UNDER 18 U.S.C. § 3582(c)(1)(A)(i) FOR THE
           "EXTRAORDINARY AND COMPELLING REASONS" CREATED BY
           THE COVID-19 PANDEMIC AND THE PRISON CONDITIONS
           WHICH PREVENT SELF-CARE FOR A HIGH-RISK PATIENT .......... 7

    II.    THE COURT CAN WAIVE THE 30-DAY REQUIREMENT FOR
           EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER 18 U.S.C.
           § 3582(c)(1)(A) BECAUSE OF THE URGENT RISK OF FATAL
           INFECTION ............................................................... 11

      A. The Plain Text Gives Courts Power to Consider a Motion for Reduction in
          Sentencing Without Requiring Full Administrative Remedies ............... 12

      B. The Legislative History of the FSA Supports The Court's Power To Grant
          Compassionate Release Without Requiring Full Administrative
          Exhaustion ......................................................... 15

      C. The Absence of Mandatory Language in the FSA's Provision
          Demonstrates that the Normal Administrative Law Exhaustion Exceptions
          Apply ............................................................... 16

          1. Futility and Irreparable Harm .............................. 17

          2. Futility Excuses Asking BOP for Relief Based on COVID-19
             Pandemic ..................................................... 17

      D. It Would Be Futile and Potentially Fatal To Require Mr. Matta-Lopez To
          Exhaust His Administrative Remedies .................................. 19

i

III.   THE COVID-19 OUTBREAK PRESENTS A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE THAT WARRANTS COMPASSIONATE RELEASE FOR MR. MATTA-LOPEZ, WHO IS A HIGH-RISK PATIENT ........................................................................... 20

A. Mr. Matta-Lopez qualifies for compassionate release under several BOP Program Statements and under 18 U.S.C. §§ 3582 and 4205(g) .............. 20

a.  BOP Program Statement 5050.50 § 3b. Debilitated Medical Condition ........................................................................................................ 20

b.  Program Statement 5050.50 § 4b. Elderly Inmates with Medical Conditions ................................................................................................ 25

c.  Program Statement 5050.50 § 4a. "New Law" Elderly Inmates ......... 25

B. The conditions of BOP incarceration foster the spread of COVID-19, and Mr. Matta-Lopez's age and preexisting conditions render him particularly susceptible to an unreasonable risk of death and an inability to take preventative measures or self-care recommended by the CDC ............... 26

IV.   THE RELEVANT § 3553(a) FACTORS, INCLUDING MR. MATTA-LOPEZ'S RELEASE PLAN, FAVOR RESENTENCING ...................... 29

V.   CONCLUSION ........................................................................................ 35

ii

# TABLE OF AUTHORITIES

## Cases

*Basank v. Decker*, No. 20-cv-2518 (S.D.N.Y. Mar. 26, 2020) .......................................6

*Basank v. Decker*, No. 20-cv-2518 (S.D.N.Y. Mar. 26, 2020) .......................................6

*Boucher v. Lamanna*, 90 F.Supp.2d 883 (N.D. Ohio 2000)........................................17

*Chevrier v. Marberry*, 2006 WL 3759909 (E.D. Mich. Dec. 20, 2006) .......................17

*Coronel v. Decker*, No. 20-cv-2472-AJN (Mar. 27, 2020) ..............................................6

*Cushenberry v. Federal Medical Center*, 530 F.Supp.2d 908 (E.D.Ky., 2008).............17

*Elwood v. Jeter*, 386 F.3d 842 (8th Cir. 2004)...............................................................17

*Fournier v. Zickefoose*, 620 F.Supp.2d 313 (D. Conn. 2009).......................................17

*Fraihat v. Wolf*, No. 20-CV-590 (C.D. Cal. Mar. 30, 2020).............................................4

*Fraley v. United States Bureau of Prisons*, 1 F.3d 924 (9th Cir. 1993).........................18

*Garza v. Davis*, 596 F.3d 1198 (10th Cir. 2010)............................................................17

*Gurzi v. Marques*, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212 (D. Minn. October 10, 2019)........................................................................................................................19

*In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020).......................................5

*In re Request to Commute or Suspend County Jail Sentences* (N.J. Mar. 22, 2020) .......5

*Kelly v. Daniels*, 469 F. Supp. 2d 903 (D. Or. 2007) .....................................................17

*Malouf v. SEC*, 933 F. F.3d 1248 (10th Cir. 2019) ........................................................17

*McCarthy v. Madigan*, 503 U.S. 140, 112 S. Ct. 1081, 117 L. Ed. 2d 291 (1992)........16

*McKart v. United States*, 395 U.S. 185, 89 S. Ct. 1657, 23 L. Ed. 2d 194 (1969).........16

*Merth v. Puentes*, 2019 U.S. Dist. LEXIS 114799 (ED CA July 10, 2019) .................18

*Pepper v. United States*, 562 U.S. 476 (2011) ...............................................................13

*Pimentel v. Gonzales*, 367 F. Supp. 2d 365 (E.D.N.Y. 2005)........................................19

*Ross v. Blake*, 136 S. Ct. 1850 (2016)........................................................12, 13, 15, 16

*Ross v. Fondren*, No. 08- 325, 2008 WL 4745671 (D. Minn. Oct. 29, 2008) ..............17

*Scott v. Lindsay*, No. 07 CV 2622(JG), 2007 WL 2585072 (E.D.N.Y. Sept. 10, 2007) 17

*Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 120 S. Ct. 1084, 146 L. Ed. 2d 1 (2000) ...........................................................................................................16

*Sims v. Apfel*, 530 U.S. 103, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000) .......................16

*Singh v. Barr*, 400 F. Supp. 3d 1005 (SD CA 2019) .......................................................... 17

*Snyder v. Angelini*, 2008 WL 4773142 (E.D.N.Y. Oct. 27, 2008) .................................. 17

*Sorbello v. Laird*, No. 06 CV 948 (JG), 2007 WL 675798 (E.D.N.Y. Feb. 28, 2007) .. 19

*Thakker v. Doll*, No. 1:20-cv-480-JEJ (Mar. 31, 2020) ...................................................... 6

*Thody v. Swain*, 2019 U.S. Dist. LEXIS 226582 (CD CA Nov. 26, 2019) ................... 18

*United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980 (N.D. Cal. Mar. 25, 2020) .......................................................................................................................... 5

*United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) ............................ 5

*United States v. Bailey,* No. 94-cr-481 (N.D. Ill. July 24, 2019) ................................... 32

*United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) ....... 5

*United States v. Basciano*, 369 F. Supp. 2d 344 (E.D.N.Y. 2005) ............................... 20

*United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505 (M.D.N.C. June 28, 2019) ............................................................................................................................... 10

*United States v. Bolston*, No. 1:18-cr-382-MLB (N.D. Ga. Mar. 30, 2020) ................... 4

*United States v. Calton*, 900 F.3d 706 (5th Cir. 2018) ................................................... 14

*United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923 (S.D. Tex. June 17, 2019) ............................................................................................................................... 10

*United States v. Cantu-Rivera*, No. CR H-89-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019) ........................................................................................................................ 10

*United States v. Caraballo-Martinez*, 866 F.3d 1233 (11th Cir. 2017) ...................... 14

*United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) ................... 6

*United States v. Davis*, No. 1:20-cr-9-ELH (D. Md. Mar. 30, 2020) .............................. 3

*United States v. Dimasi*, 220 F. Supp. 3d 173 (D. Mass. 2016) ...................................... 9

*United States v. Edwards*, No. 6:17-cr-3-NKM (Apr. 2, 2020) .................................... 34

*United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086 (D. Me. July 11, 2019) ......................................................................................................................................... 10

*United States v. Gonzalez*, No. 2:18-cr-232-TOR (E.D. Wash. Mar. 31, 2020) ........... 35

*United States v. Green*, 886 F.3d 1300 (10th Cir. 2018) .............................................. 14

*United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ................................... 5

*United States v. Hector*, No. 2:18-cr-3-002 (W.D. Va. Mar. 27, 2020) ......................... 4

*United States v. Hernandez*, No. 18-cr-20474 (S.D. Fla. Apr. 2, 2020) ...................... 34

*United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) ....................................... 4

iv

*United States v. Kennedy*, No. 5:18-cr-20315 (E.D. Mich. Mar. 27, 2020) .................... 4

*United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349 (S.D. Ala. Aug. 13, 2019) ................................................................................................................................... 10

*United States v. Marin*, No. 15-cr-252 (E.D.N.Y. Mar. 30, 2020) ................................... 3

*United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227 (D. Idaho Mar. 16, 2020) ....................................................................................................................... 5

*United States v. McGraw,* No. 02 Cr. 18 (LJM-CMM), 2019 WL 2059488 (S.D. Ind. May 9, 2019) ............................................................................................................... 33, 34

*United States v. Meekins*, No. 1:18-cr-222-APM (D.D.C. Mar. 31, 2020) ..................... 3

*United States v. Mills*, 2019 U.S. Dist. LEXIS 10954 (MD FL January 23, 2019) ....... 18

*United States v. Muniz*, No. 4:09-cr-199 (S.D. Tex. Mar. 30, 2020) ............................... 3

*United States v. Perez*, No. 1:17-cr-513-AT (S.D.N.Y. Apr. 1, 2020) ........................... 35

*United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225 (S.D.N.Y. Mar. 19, 2020) ....................................................................................................................................... 5

*United States v. Powell*, No. 1:94-cr-316-ESH (D.D.C. Mar. 28, 2020) ......................... 4

*United States v. Rodriguez*, No. 2:03-cr-271-AB (E.D. Pa. Apr. 1, 2020) ................... 35

*United States v. Spears*, No. 3:98-Cr.-208-SI-22, 2019 WL 5190877 (D. Or. Oct. 15, 2019) ..................................................................................................................................... 33

*United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) ....................................................................................................................................... 5

*United States v. Trujillo*, 713 F.3d 1003 (9th Cir. 2013) ............................................... 14

*United States v. Underwood*, No. 8:18-cr-201-TDC (Mar. 31, 2020) ............................. 6

*United States v. v. Taylor*, 778 F.3d 667 (7th Cir. 2015) ............................................... 14

*United States v. Williams*, No. 3:04-cr-95-MCR-CJK (Apr. 1, 2020) ......................... 35

*United States v. Young*, No. 2:00-CR-00002-1, 2020 WL 1047815, 2020 U.S. Dist. LEXIS 37395 (M.D. Tenn. Mar. 4, 2020) ........................................................................ 16

*United States v.Michaels*, No. 8:16-cr-76-JVS (C.D. Cal. Mar. 26, 2020) ..................... 4

*Woodall v. Federal Bureau of Prisons*, 432 F.3d 235 (3d Cir. 2005) ............................ 17

*Woodford v. Ngo*, 548 U.S. 81 (2006) ....................................................................... 13, 16

*Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) ........... 3

*Zucker v. Menifee*, 2004 WL 102779 (S.D.N.Y. Jan. 21, 2004) ................................... 17

## Statutes

8 C.F.R. § 1003.19(e) ........................................................................................ 17

18 U.S.C. § 3142(e) ............................................................................................. 4

18 U.S.C. § 3142(i) .............................................................................................. 4

18 U.S.C. § 3553(a) .....................................................................................passim

18 U.S.C. § 3582 ................................................................................... 7, 20, 21

18 U.S.C. § 3582(c) ....................................................................................... 8, 14

18 U.S.C. § 3582(c)(1)(A) ...........................................................................passim

18 U.S.C. § 3582(c)(1)(A)(i) ...................................................................... 7, 8, 29

18 U.S.C. § 3582(c)(2) ...................................................................................... 14

18 U.S.C. § 3582(d) .......................................................................................... 18

18 U.S.C. § 3582(d)(1) ...................................................................................... 18

18 U.S.C. § 3582(d)(2)(A)(I) ............................................................................ 18

18 U.S.C. § 3582(d)(2)(A)(iv) ........................................................................... 18

18 U.S.C. § 3582(d)(2)(A)(iii) ........................................................................... 18

18 U.S.C. § 4205(g) ........................................................................................... 21

28 U.S.C. § 994(o) ............................................................................................. 14

28 U.S.C. § 994(t) ............................................................................................... 9

42 U.S.C. § 1997e(a) .................................................................................... 13, 15

42 U.S.C. §§ 5121-5207 ...................................................................................... 2

U.S.S.G. § 1B1.13 ........................................................................................passim

Prison Litigation Reform Act of 1995 ............................................................ 13, 15

Stafford Disaster Relief and Emergency Assistance Act § 501 (b) ................................ 2

## Other Authorities

"Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020) ............................ 28

"An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues," *The New York Times* (March 16, 2020) ...................................................................... 7

"*Coronavirus in the United States*," New York Times, Updated April 3, 2020 ............. 2

"Coronavirus Map: Tracking the Global Outbreak," *New York Times* (March 25, 2020) ..................................................................................................26

"Federal Bureau of Prisons Covid-19 Action Plan," ...................................................27

"People At Risk for Serious Illness from COVID-19," CDC (March 12, 2020) ...........27

"Prisons and Jails are Vulnerable to COVID-19 Outbreaks," *The Verge* (Mar. 7, 2020) ..................................................................................................28

"*Severe Outcomes Among Pateints with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16, 2020,*" Centers for Disease Control and Prevention Report (March 18, 2020) ........................................................... 6

"White House Tells Travelers from New York to Isolate as City Cases Soar," *New York Times* (March 24, 2020) .........................................................................28

164 CONG. REC. H10358 (daily ed. Dec. 20, 2018) ..................................................16

164 CONG. REC. H10361-H10362 (Dec. 20, 2018) ..................................................16

164 CONG. REC. S7774 (daily ed. Dec. 18, 2018) ....................................................16

COVID-19 Emergency Declaration," Federal Emergency Management Agency, March 13, 2020 .................................................................................................... 2

Ghebreyesus, Tedros Adhanom, *Opening Remarks*, Media Briefing on COVID-19, *World Health Organization*, March 11, 2020 .......................................... 2

*Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19*," State of California, March 5, 2020 ......................... 2

II R. Pierce, Administrative Law Treatise § 15 (4th ed. 2002) ................................... 17

Joseph A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases* 45(8): 1047-1055 (2007) ............................................................27

Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Coronavirus When Purell is Contraband?," *ABA Journal* (March 13, 2020) ...........................28

Kindy, Kimberly, *"An explosion of coronavirus cases cripples a federal prison in Louisiana,"* Washington Post (March 29, 2020) ......................................... 2

Kindy, Kimberly; Brown, Emma; Bennett, Dalton, *"'Disaster waiting to happen': Thousands of inmates released as jails and prisons face coronavirus threat,"* Washington Post, March 25, 2020 .............................................................. 2

Michael Kaste, "Prisons and Jails Worry About Becoming Coronavirus 'Incubators'," *NPR* (March 13, 2020) ...............................................................................28

Pavlo, Walter, *"Bureau of Prisons Underreporting COVID-19 Outbreaks In Prison,"* Forbes, April 1, 2020....................................................................................3

Peter Wagner & Emily Widra, "No Need to Wait For Pandemics: The Public Health Case for Criminal Justice Reform," *Prison Policy Initiative* (March 6, 2020) .......... 29

Shon Hopwood, *Second Looks & Second Chances*, 41 Cardozo L. Rev. 83 (Oct. 2019) ................................................................................................................ 15

Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration,* 21 Fed. Sent'g Rep. 167 (2009) ................................... 15

U.S. Dep't of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program,* I-2023-006 (Apr. 2013) ........................................ 9

U.S. Dep't Justice, *The Federal Bureau of Prisons' Compassionate Release Program*, p. 11 (2013) ................................................................................................ 15

US Senate Committee on the Judiciary, "Report on the Comprehensive Crime Control Act of 1983," No. 98-225 (1983) ................................................................ 8

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### BACKGROUND

On April 5, 1988, Mr. Matta-Lopez was abducted from his home in Tegucigalpa, Honduras by U.S. Marshals with the assistance of elements of the Honduran military. Although Mr. Matta offered no resistance, United States Marshals bound Mr. Matta-Lopez, placed a hood over his head, and drove him to a United States Air Force Base in Honduras, where he was transported to the federal penitentiary at Marion, Illinois. He was 43 years of age at the time of his abduction and has remained in continuous federal custody for over 31 years. Mr. Matta-Lopez is currently 75 years of age and suffers from a wide variety of severe physical and mental afflictions including chronic obstructive pulmonary disease (COPD) and congestive heart failure (CHF) that make his daily life a struggle and make him particularly susceptible to the ravages of the current viral epidemic.

Mr. Matta-Lopez is currently serving life sentences at United States Penitentiary - Canaan in Waymart, Pensylvania, for the following cases: (1) Central District of California Case No. 85-cr-00606-PAR: Judgment and Commitment (J&C) dated January 16, 1990; and (2) Central District of California Case No. 88-cr-00129-WJR: J&C dated March 13, 1991. Both of these convictions were on charges for conspiracy to distribute narcotics, and alleged that Mr. Matta-Lopez was a supplier of large quantities of cocaine into the United States. The particular allegations involve drug networks and criminal enterprises that no longer exist and have not existed for decades. After 31 years in federal custody, Mr. Matta-Lopez no longer has the desire or physical and mental capacity to engage in any further such activity, and is no longer a danger to the community.

On March 27, 2020, Mr. Matta-Lopez filed an administrative relief request with USP Canaan likewise seeking compassionate release on the same grounds as submitted herein. Because of the urgency of the spread of COVID-19 in federal prisons and in the

Northeast region of the United States, we respectfully ask the Court to waive the 30-day waiting period for any response by the warden. Waiting for a response could cost Mr. Matta-Lopez his life.

### ARGUMENT

Mr. Matta-Lopez would be a prime candidate for compassionate release in normal times. These, however, are not normal times. On March 11, 2020, the World Health Organization (WHO) officially classified COVID-19 as a pandemic.[1] On March 19, 2020, President Donald Trump declared the pandemic of "sufficient severity and magnitude to warrant an emergency declaration for all states" pursuant to § 501 (b) of the Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5207.[2] As of April 2, 2020, Pennsylvania, where Mr. Matta-Lopez is serving his sentence, has 8,420 confirmed cases resulting in 102 deaths.[3]

"Public health and corrections officials have issued dire warnings that cramped and unsanitary conditions could turn prisons into a haven for the virus, endangering not just inmates but also corrections officers and prison health-care workers as well as their families and communities."[4] Indeed, the situation is already deteriorating.[5] The Bureau of Prisons has started posting the number of positive tests for inmates and staff on a special page for COVID-19, acknowledging the "rapidly evolving nature of this public

---

[1] Ghebreyesus, Tedros Adhanom, *Opening Remarks*, Media Briefing on COVID-19, *World Health Organization*, March 11, 2020.

[2] See "*Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19*," State of California, March 5, 2020; "COVID-19 Emergency Declaration," Federal Emergency Management Agency, March 13, 2020

[3] *See* "*Coronavirus in the United States*," New York Times, Updated April 3, 2020.

[4] Kindy, Kimberly; Brown, Emma; Bennett, Dalton, *"'Disaster waiting to happen': Thousands of inmates released as jails and prisons face coronavirus threat,"* Washington Post, March 25, 2020.

[5] Kindy, Kimberly, *"An explosion of coronavirus cases cripples a federal prison in Louisiana,"* Washington Post, March 29, 2020.

2

health crisis."[6] As of April 2, 2020, the BOP acknowledges 75 inmates and 39 staff members who have tested positive, but it is likely that these numbers are understated.[7]

Given the severity of the situation, courts from around the country are recognizing that COVID-19 is a circumstance that is dispositive in deciding bail motions, compassionate release motions, furloughs, and self-surrender dates. *See, e.g*, *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "[I]n light of the rapidly escalating public health crisis"); *United States v. Meekins*, Case No. 1:18-cr-222-APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-sentence release order releasing defendant with three pending assault charges due to extraordinary danger COVID-19 poses to folks in detention); *United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community, and to preserve Sixth Amendment rights in this perilous time); *United States v. Marin*, No. 15-cr-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); *United States v. Muniz*, Case No. 4:09-cr-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems

---

[6] See https://www.bop.gov/coronavirus/ (last visited April 3, 2020). The site currently lists 91 inmates infected – ***including one inmate testing positive at USP Canaan.*** Also 50 staff, and ***at least 7 dead. 1800% growth in BOP cases in 1 week.***

[7] Pavlo, Walter, *"Bureau of Prisons Underreporting COVID-19 Outbreaks In Prison,"* Forbes, April 1, 2020.

nonetheless remain particularly vulnerable to infection."); *Fraihat v. Wolf*, No. 20-CV-590 (C.D. Cal. Mar. 30, 2020) (noting risk of asymptomatic spread and unsafe conditions in immigration detention mean "[t]he balance of equities tip sharply in [Fraihat's] favor" and thus ordering release); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Hector*, Case No. 2:18-cr-3-002, Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to folks in prison); *United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (post-plea presentence release of defendant whose pretrial release was revoked because "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is *necessary* for Defendant to prepare his pre-sentence defense"); *United States v. Powell*, No. 1:94-cr-316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Mclean,* No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v.Michaels*, 8:16-cr-76-JVS, Minute Order, dkt. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in

4

jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *see also United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (*sua sponte* inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"); *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate

population of the Wahoe County Detention Facility"); *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting First Step Act relief to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *Thakker v. Doll*, No. 1:20-cv-480-JEJ (Mar. 31, 2020) (granting TRO releasing high-risk immigration detainees from custody due to the dangers of COVID-19); *Basank v. Decker*, No. 20-cv-2518, (S.D.N.Y. Mar. 26, 2020) ("*[t]he nature* of detention facilities makes exposure and spread of the [coronavirus] particularly harmful" so granting TRO and releasing high-risk plaintiffs); *Coronel v. Decker*, 20-cv-2472-AJN, Dkt. No. 26 (Mar. 27, 2020) (granting TRO and releasing from immigration detention facility in light of COVID-19); *Basank v. Decker*, 20-cv-2518 (S.D.N.Y. Mar. 26, 2020) (same); *United States v. Underwood*, Case No. 8:18-cr-201-TDC, Dkt. No. 179 (Mar. 31, 2020) (encouraging release to furlough of elderly defendant in BOP custody because, even though no positive of COVID-19 in his facility, "there is significant potential for it to enter the prison in the near future").

Mr. Matta-Lopez is 75 years old. His health is extremely fragile. He suffers from a wide variety of severe physical and mental afflictions that make his daily life a struggle. These include chronic pulmonary disease, which will eventually require that he use a personal oxygen treatment, and congestive heart failure. Now, however, because of the unthinkable spread of a global pandemic that is killing the elderly who have pre-existing medical conditions like Mr. Matta-Lopez at alarming rates of approximately 11%, he faces a serious risk of dying in prison if infected.[8] Given his age and medical conditions, we are extremely concerned that when (and not if) the COVID-

---

[8] *See* "*Severe Outcomes Among Pateints with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16, 2020,*" Centers for Disease Control and Prevention Report (March 18, 2020), available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm

19 virus spreads through the facility at USP Canaan, it will be a death sentence for Mr. Matta-Lopez. See id. ("a majority of coronavirus disease 2019 (COVID-19) deaths have occurred among adults aged ≥ 60 years and among persons with serious underlying health conditions.")

This unparalleled health crisis in our country and its deadly expected arrival in our prisons present "extraordinary and compelling reasons" to grant Mr. Matta-Lopez's motion. The conditions at USP Canaan make it impossible for Mr. Matta-Lopez to self-care and prevent his infection if the virus is found at the facility. "Social distancing" is not an option for most of our federal inmates. The New York Times recently explained why jails are a much more dangerous place to be than even a cruise ship.[9]

As to the Section 3553(a) factors, Mr. Matta-Lopez, at 75, is not a danger to the community. He simply wishes to live out his final years at the home of his beloved children. He poses no harm to others and can safely shelter in place in their care. Mr. Matta-Lopez asks this Court to give him a chance of survival.

## I. THIS COURT HAS AUTHORITY TO RESENTENCE MR. MATTA-LOPEZ UNDER 18 U.S.C. § 3582(c)(1)(A)(i) FOR THE "EXTRAORDINARY AND COMPELLING REASONS" CREATED BY THE COVID-19 PANDEMIC AND THE PRISON CONDITIONS WHICH PREVENT SELF-CARE FOR A HIGH-RISK PATIENT

With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of BOP to resentence prisoners under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons." Importantly, the reasons that can justify resentencing need not involve only terminal illness or urgent dependent care for minor children.

---

[9] *See* "An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues," *The New York Times* (March 16, 2020), available at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.

Congress first enacted the modern form of the compassionate release statute, codified at 18 U.S.C. § 3582, as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a sentencing court can reduce a sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, Congress conditioned the reduction of sentences on the BOP Director's filing of an initial motion to the sentencing court. Absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for compassionate release. *Id.*

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c). But the legislative history to the statute gives an indication of how Congress thought the statute should be employed by the federal courts. The Senate Committee stressed how some individual cases, even after the abolishment of federal parole, still may warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness*, cases in which other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

S. Rep. No. 98-225, at 55-56 (1983) (emphasis added). Congress intended that the circumstances listed in § 3582(c) would act as "safety valves for modification of sentences," *id.* at 121, enabling judges to provide second looks for possible sentence reductions when justified by various factors that previously could have been addressed through the abolished parole system. This safety valve statute would "assure the availability of specific review and reduction of a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." *Id.* Noting that this approach would keep "the sentencing power in the

judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly *compelling situations*." *Id.* (emphasis added).

Congress initially delegated the responsibility for outlining what could qualify as "extraordinary and compelling reasons" to the U.S. Sentencing Commission ("Commission"). *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). The Commission took considerable time to promulgate its policy in response to Congress's directive. It finally acted in 2007, almost a generation later, with the very general guidance that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, app. n.1(A). However, this guidance did little to spur the BOP to file on behalf of prisoners who might have met these general standards. After a negative Department of Justice Inspector General report found that the BOP rarely invoked its authority under the statute to move for reduced sentences, the Commission felt compelled to act again. *See* U.S. Dep't of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program,* I-2023-006 (Apr. 2013). The Commission amended its policy statement on "compassionate release" in November 2016. *See* U.S.S.G. § 1B1.13 Amend. (11/1/2016). In addition to broadening the eligibility guidelines for sentencing courts, the new policy statement admonished the BOP for its past failures to file motions on behalf of inmates who had met the general criteria identified in U.S.S.G. § 1B1.13. *See* U.S.S.G. § 1B1.13, n.4; *see also United States v. Dimasi*, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the history of the BOP, DOJ and Commission's interplay in developing guidance for "compassionate release" motions). Notably, the Commission concluded that reasons beyond medical illness, age, and family circumstances could qualify as "extraordinary and compelling reasons" for resentencing. *Id.,* n.1(A) (including a category for "Other Reasons," when there is "an extraordinary and compelling reason

9

other than, or in combination with, the reasons described in subdivisions (A) through (C).").[10]

The Commission's actions, however, did little to change the dearth of filings by the BOP on behalf of inmates who satisfied the Commission's general guidance. During the more than three decades during which the BOP was the exclusive gatekeeper for "compassionate release" motions, very little effort was made to implement Congress's intention to provide a safety valve to correct injustices or allow relief under extraordinary and compelling circumstances.

Finally, this changed with the passage of the First Step Act in 2018. *See* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which § 3582(c)(1)(A) compassionate release occurs: instead of depending upon the BOP Director to determine an extraordinary circumstance and move

---

[10] *But see United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (holding that, given the changes to the compassionate release statute by the First Step Act, U.S.S.G. § 1B1.13, application note 1(D) "no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582."); *United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); *United States v. Cantu-Rivera*, No. CR H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect."); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (holding that application note 1(D) is "inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when BoP finds they are not appropriate," and courts thus may "consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement"); *but see United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019) (holding that application note 1(D) governs compassionate release reductions of sentence and federal judges have no authority to create their own criteria for what constitutes an "extraordinary and compelling" reason for resentencing).

for release, a court can now resentence "upon motion of the defendant," after the inmate exhausted administrative remedies with the BOP, or after 30 days from the receipt of the inmate's request for compassionate release with the warden of the defendant's facility, whichever comes earlier. 18 U.S.C. § 3582(c)(1)(A). Thus, under the First Step Act, a court may now consider the defendant's own motion to be resentenced, without waiting for it to be made by the BOP.

Courts are now authorized to consider a defendant's motion, even one which the BOP opposes, and order resentencing if a resentencing court finds that "extraordinary and compelling reasons" warrant a reduction and such a reduction is consistent with the Section 3553(a) factors. *Id.* Resentencing courts are also advised that any decision to reduce a previously ordered sentence be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.*

Here, while the 30-day period since the warden's receipt of Mr. Matta-Lopez's request for compassionate release due to the threat of coronavirus infection has not yet passed, this Court can construe the exhaustion requirement as futile given the urgency of this national emergency and rapid spread of the pandemic.

## II.   THE COURT CAN WAIVE THE 30-DAY REQUIREMENT FOR EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER 18 U.S.C. § 3582(c)(1)(A) BECAUSE OF THE URGENT RISK OF FATAL INFECTION

Mr. Matta-Lopez filed his petition with the warden on March 27, 2020. Under section 3582(c)(1)(A), Mr. Matta-Lopez would ordinarily be required to either wait 30 days following the warden's receipt of his compassionate release request, or exhaust all administrative remedies prior to approaching the Court, whichever happens earlier. *See* 18 U.S.C. § 3582(c)(1)(A). However, the Court may waive these administrative exhaustion requirements, and should do so here.

//

11

### A. The Plain Text Gives Courts Power to Consider a Motion for Reduction in Sentencing Without Requiring Full Administrative Remedies

The First Step Act's (FSA's) compassion release provision grants the sentencing court the power to reduce a prisoner's sentence in two circumstances: when "(I) extraordinary and compelling reasons warrant such a reduction" or "(ii) the defendant is at least 70 years of age" and meets other criteria. The statutory text does not require exhaustion of administrative remedies in all contexts. Instead, it permits courts to modify a term of imprisonment once it has been imposed:

(1)     in any case—

    (A)     . . . the court, upon motion of the Director of the Bureau of Prisons or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier …..

18 U.S.C. § 3582(c)(1)(A). This language does not make exhaustion of administrative remedies mandatory. The plain text gives the Court power and authority to reduce a sentence even without exhaustion of remedies in two contexts. The Court has such power whenever the Director of the Bureau of Prisons makes the motion or "the lapse of 30 days from the receipt of [a] request by the warden of the defendant's facility . . . ." *Id.*

The question then is whether the courts have the power, in light of the COVID-19 pandemic, to create an exception to the 30-day period set by Congress.

The Supreme Court has clearly held that the courts' power to create exceptions to a statutory exhaustion requirement depends on the language of the statute. "[A] statutory exhaustion provision stands on a different footing [from a judicially created one]. There, Congress sets the rules — and courts have a role in creating exceptions only if Congress wants them to." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).

12

1    In the Prison Litigation Reform Act of 1995 (PLRA) cases, such as *Ross*, the

2  Supreme Court ruled that courts do not have the power to create emergency exceptions

3  to the exhaustion requirement because Congress created a mandatory requirement. It

4  reached this conclusion because the PLRA used mandatory language in setting out the

5  administrative remedies exhaustion standard.

6    The PLRA's exhaustion language is markedly different from the FSA's language.

7  The PLRA language reads:

8          No action shall be brought with respect to prison conditions under
9          section 1983 of this title, or any other Federal law, by a prisoner
           confined in any jail, prison, or other correctional facility *until such*
10         *administrative remedies as are available are exhausted.*

11  *Ross,* 136 S. Ct. at 1856, 42 U.S.C. § 1997e(a) (emphasis added). The Supreme Court

12  focused on the "*no action shall be brought . . . until*" language in the PLRA. "[T]he

13  PLRA's text suggests no limits on an inmate's obligation to exhaust — irrespective of

14  any 'special circumstances.'" *Id.; see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006)

15  (proper exhaustion of administrative remedies is necessary.) Given this mandatory

16  language, the Court concluded "mandatory language means a court may not excuse a

17  failure to exhaust, even to take such circumstances into account." *Id.*

18    As quoted earlier, the FSA's language has nothing akin to the mandatory language

19  found by the *Ross* court to be controlling for the PLRA exhaustion requirement.

20    This view of § 3582(c)(1)(A) finds support in the fact that district courts must take

21  into account factual developments that *post*-date exhaustion in deciding the motion for a

22  reduction in sentence. Section 3582(c)(1)(A) requires consideration of the Section

23  3553(a) factors. The Supreme Court has said that, when conducting the analysis under

24  Section 3553(a), a district court must consider the individual and his circumstances as

25  they exist *at that moment. See Pepper v. United States*, 562 U.S. 476, 492 (2011) (holding

26  that a sentencing court must base Section 3553(a) analysis on "the most up-to-date

27  picture" of a defendant's history and characteristics). When the focus of the court's

28

13

decision is on whether extraordinary and exceptional circumstances exist, the constantly changed facts about the COVID-19 pandemic need to be considered. To require re-exhaustion of these new facts would leave prisoners without the ability to seek relief from the court. That is plainly contrary to the FSA's language and the legislative intent to permit prisoners to file such motions on their own behalf.

The courts' power under § 3582(c)(2) also supports this view that administrative exhaustion is not jurisdictionally required. Subsection (c)(2) is a another provision that grants courts the power to "reduce the term of imprisonment." In subsection (c)(2), the court may act "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. § 994(o)" "after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . ." 3582(c)(2). The Circuits have found that the district courts have jurisdiction to consider the motion to reduce a sentence because the courts are empowered generally to have jurisdiction over federal criminal cases. Section 3582(c) is not the source of the court's jurisdiction. *See United States v. v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015) ("[Section] 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment. . . [n]or is subsection (c) phrased in jurisdictional terms."); *see also United States v. Calton*, 900 F.3d 706, 710-11 (5th Cir. 2018)(citing *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1243 (11th Cir. 2017); *United States v. May*, 855 F.3d 271, 274-75 (4th Cir. 2017); *United States v. Trujillo*, 713 F.3d 1003, 1005 (9th Cir. 2013); *see also United States v. Green*, 886 F.3d 1300, 1306 (10th Cir. 2018) (rejecting claim of jurisdictional bar). Accordingly, § 3582(c) generally should not be understood to impose jurisdictional prerequisites.

//

14

### B. The Legislative History of the FSA Supports The Court's Power To Grant Compassionate Release Without Requiring Full Administrative Exhaustion

The *Ross* Court also looked at the history of the PLRA to assess whether Congress intended the statutory language to be mandatory. The Court found the PLRA's history "underscores the mandatory nature of its exhaustion regime" because the PLRA replaced a predecessor "statutory scheme [that] made exhaustion 'in large part discretionary'" and "substituted an 'invigorated' exhaustion provision." *Id.* 1857-58. The PLRA statutory language includes a qualifier: "the remedies must indeed be 'available' to the prisoner." Id. Thus, the *Ross* Court remanded the case for further consideration of whether the prisoner had "available" remedies to exhaust. *Id.* at 1862. It did so because the statutory language stated that exhaustion was required "as [administrative remedies] are available . . . " *Id.* at 1856, 1862; 42 U.S.C. § 1997e(a).

In contrast, the FSA's amendments to the compassionate release law was Congress's response to the BOP's failure to "properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." U.S. Dep't Justice, *The Federal Bureau of Prisons' Compassionate Release Program*, p. 11 (2013)[11]; *see generally* Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration,* 21 Fed. Sent'g Rep. 167 (2009); Shon Hopwood, *Second Looks & Second Chances*, 41 Cardozo L. Rev. 83 (Oct. 2019). The changes made

---

[11] More specifically, the Inspector General found the BOP: (1) failed to provide adequate guidance to staff regarding the medical and nonmedical criteria for compassionate release consideration; (2) had no timeliness standards for reviewing compassionate release requests, and timeliness standards for inmate appeals do not consider the special circumstances of medical compassionate release requests; (3) did not have formal procedures to inform inmates about the compassionate release program; and (4) failed to have a system to track compassionate release requests, the timeliness of the review process, or whether decisions made by institution and Regional Office staff are consistent with each other or with BOP policy. U.S. Dep't Justice, The Federal Bureau of Prisons' Compassionate Release Program, p. 11.

15

to section 3582(c)(1)(A) were intended to reform sentencing decision and increase the use of the "compassionate release" provisions that already existed. The legislative history of the First Step Act supports the view that the exhaustion requirement is subject to exceptions. The purpose of the FSA's amendment to section 3582(c)(1)(A), permitting prisoners to file the motion for a reduction in sentence, was intended to increase the use of that mechanism. The FSA entitled this section "Increasing the Use and Transparency of Compassionate Release." 164 CONG. REC. H10358 (daily ed. Dec. 20, 2018). Senator Cardin noted the First Step Act made several reforms to the federal prison system, including "expedit[ing] compassionate release applications." 164 CONG. REC. S7774 (daily ed. Dec. 18, 2018). *See United States v. Young*, No. 2:00-CR-00002-1, 2020 WL 1047815, at *5, 2020 U.S. Dist. LEXIS 37395, *14 (M.D. Tenn. Mar. 4, 2020) (noting intent to expedite compassionate release applications). Congressman Nadler noted that the FSA included "a number of very positive changes, such as . . . improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 CONG. REC. H10361-H10362 (Dec. 20, 2018).

### C. The Absence of Mandatory Language in the FSA's Provision Demonstrates that the Normal Administrative Law Exhaustion Exceptions Apply

While Justice Breyer in *Ross* concurred with the majority's outcome, he wrote separately to remind us that the term "exhausted" in administrative law includes "well-established exceptions to exhaustion." 136 S. Ct. at 1863, citing *Woodford v. Ngo*, 548 U.S. 81, 103, 126 S. Ct. 2378, 2393, 165 L. Ed. 2d 368 (2006). *See also Sims v. Apfel*, 530 U.S. 103, 115, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000) (Breyer, J., joined by Rehnquist, C. J., and Scalia and Kennedy, JJ., dissenting) (recognizing futility, constitutional claims as exceptions); *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13, 120 S. Ct. 1084, 146 L. Ed. 2d 1 (2000) (futility); *McKart v. United States*, 395 U.S. 185, 197-201, 89 S. Ct. 1657, 23 L. Ed. 2d 194 (1969)(hardship); *McCarthy v. Madigan*, 503 U.S. 140, 147-148, 112 S. Ct. 1081, 117 L. Ed. 2d 291 (1992)

16

(inadequate or unavailable administrative remedies); see generally II R. Pierce, Administrative Law Treatise § 15 (4th ed. 2002); *Malouf v. SEC*, 933 F. F.3d 1248 (10th Cir. 2019) (security law includes exhaustion exception under "reasonable" circumstances); *Singh v. Barr*, 400 F. Supp. 3d 1005, 1013 (SD CA 2019) (waiving administrative exhaustion for redetermination of bond decision under 8 C.F.R. § 1003.19(e) because "no relevant circumstances have changed").

### 1. Futility and Irreparable Harm

When a prisoner is facing irreparable harm and futility, courts have waived exhaustion of administrative remedies. *Garza v. Davis*, 596 F.3d 1198, 1203-04 (10th Cir. 2010) (recognizing futility exception in context of § 2241 petition); *Woodall v. Federal Bureau of Prisons*, 432 F.3d 235, 239 n.2 (3d Cir. 2005)("[E]xhaustion would be futile, given that Woodall is not challenging the application of the BOP regulations, but their validity."); *Elwood v. Jeter*, 386 F.3d 842, 844, n.1 (8th Cir. 2004); *Fournier v. Zickefoose*, 620 F.Supp.2d 313, 317 (D. Conn. 2009); *Boucher v. Lamanna*, 90 F.Supp.2d 883, 887 (N.D. Ohio 2000) (concluding that exhaustion of administrative remedies would be futile where the BOP's policy on categorizing the prisoner's offense as a violent crime was mandatory, the issue was a legal one that the BOP had consistently defended, and the potential for immediate release counseled timely consideration of the petitioner's case); *see also Chevrier v. Marberry*, 2006 WL 3759909, *2-3 (E.D. Mich. Dec. 20, 2006); *Cushenberry v. Federal Medical Center*, 530 F.Supp.2d 908, 912 (E.D.Ky., 2008); *Zucker v. Menifee*, 2004 WL 102779, *4 (S.D.N.Y. Jan. 21, 2004); *Snyder v. Angelini*, 2008 WL 4773142, *2 (E.D.N.Y. Oct. 27, 2008); *Ross v. Fondren*, No. 08-325, 2008 WL 4745671 (D. Minn. Oct. 29, 2008); *Kelly v. Daniels*, 469 F. Supp. 903, 904 (D. Or. 2007); *Scott v. Lindsay*, No. 07 CV 2622(JG), 2007 WL 2585072, at *2 (E.D.N.Y. Sept. 10, 2007).

### 2. Futility Excuses Asking BOP for Relief Based on COVID-19 Pandemic

In the compassionate release context, courts have recognized that under the right circumstances, seeking relief from BOP can be futile and so exhaustion of administrative

remedies is waived. *Thody v. Swain*, 2019 U.S. Dist. LEXIS 226582, * 5 (CD CA Nov. 26, 2019) (March 22, 2020 finding prisoner failed to demonstrate futility), citing *Fraley v. United States Bureau of Prisons*, 1 F.3d 924 (9th Cir. 1993)(where administrative appeal to Regional Director certainly denied request based on BOP policy, further application for administrative remedies would be futile); *Merth v. Puentes*, 2019 U.S. Dist. LEXIS 114799, *8 (ED CA July 10, 2019) (holding administrative exhaustion of FSA's good time credits provision futile and so waived). *Cf United States v. Mills*, 2019 U.S. Dist. LEXIS 10954, *3 (MD FL January 23, 2019) (prisoner cannot invoke futility of administrative remedies when he requested compassionate release before the enactment of FSA.)

These conclusions are supported by other provisions in the FSA. Specifically, the Act carves out notice and expedited administrative consideration for prisoners with terminal illnesses. 18 U.S.C. § 3582(d). The Act broadly defines a "terminal illness" as "a disease or condition with an end-of-life trajectory." Id. § 3582(d)(1). It then imposes on BOP the obligation to give notice to the defendant and others " not later than 72 hours after the diagnosis" "with a terminal illness." 18 U.S.C. § 3582(d)(2)(A)(I). Upon request, the BOP is to "ensure that Bureau of Prisons employees assist the defendant in the preparation, drafting, and submission of a request for a sentence reduction pursuant to subsection (c)(1)(A); and . . . not later than 14 days of receipt of a request for a sentence reduction submitted on the defendant's behalf . . . process the request . . . ." *Id.*, § 3582(d)(2)(A)(iii), (iv).

Both the language of the FSA and the legislative history support the conclusion that full exhaustion of administrative remedies is subject to exceptions and it is not mandatory.

//

### D. It Would Be Futile and Potentially Fatal To Require Mr. Matta-Lopez To Exhaust His Administrative Remedies

The futility and potentially irreparable harm of requiring Mr. Matta-Lopez to wait a minimum of 30 days to exhaust his administrative remedies are manifest. He seeks this emergency relief to avoid contracting COVID-19 at USP Canaan where he has a high risk of infection: "social distancing" is impossible in the crowded facility, and soap, hand sanitizer and disinfectant products are scarce. Waiting for Mr. Matta-Lopez to exhaust his administrative remedies would only compound his risk of exposure to COVID-19. Should he contract the virus while waiting for an administrative response any remedy will come too late—he will be in mortal danger, causing him potentially irreparable physical harm, and rendering this compassionate release request utterly moot. *See, e.g., Sorbello v. Laird*, No. 06 CV 948 (JG), 2007 WL 675798, at *3 n.8 (E.D.N.Y. Feb. 28, 2007) (refusing to dismiss petition requesting designation to halfway house "for failure to exhaust administrative remedies" where delay in processing administrative remedies would "result in the irreparable harm of late designation to community confinement"); *Pimentel v. Gonzales*, 367 F. Supp. 2d 365, 371 (E.D.N.Y. 2005) (addressing merits of request for designation to halfway house, where "not only would an administrative appeal be futile, but without immediate relief by this court, Pimentel could suffer irreparable harm," as "[w]ere Pimentel required to pursue administrative remedies prior to bringing this action, he would likely be done serving much, if not all of his entire sentence such that his request would become moot.").[12]

---

[12] The factual questions at issue—the rapid spread of COVID-19, the serious danger to certain high-risk individuals, and Mr. Matta-Lopez's health conditions placing him squarely in the highest fatal risk group—are well-developed in the record before this Court, thus rendering administrative exhaustion all but pointless. *See Gurzi v. Marques*, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212, at *2 (D. Minn. October 10, 2019)("given the clear circumstances here, a principal purpose of administrative exhaustion, the development and crystallization of the factual record, is not implicated in this case." (quotation marks and citations omitted)).

19

The Bureau of Prisons has known for months of the impending COVID-19 crisis, creating a further reason to excuse Mr. Matta-Lopez's failure to exhaust all administrative remedies. The BOP has had ample opportunity to adequately prepare USP Canaan for this emerging health crisis, which would have obviated the need for Mr. Matta-Lopez's emergency compassionate release petition. Because the BOP was on notice of the potential dangers to inmates like him, Mr. Matta-Lopez should not be required to wait while the BOP takes additional time addressing his administrative request. *See United States v. Basciano*, 369 F. Supp. 2d 344, 349 (E.D.N.Y. 2005)(despite failure to exhaust administrative remedies, because "the BOP ha[d] not addressed [his] request for relief in a timely fashion," despite "ample opportunity" to do so, the court found that "[t]he administrative appeals process would thus, in the circumstances of this case, be an empty formality that would risk exposing Basciano to irreparable harm"). Mr. Matta-Lopez should not be forced to bear the brunt of the facility's failure to adequately prepare for COVID-19. In these extraordinary circumstances, the Court should waive the administrative exhaustion requirement in § 3582.

## III. THE COVID-19 OUTBREAK PRESENTS A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE THAT WARRANTS COMPASSIONATE RELEASE FOR MR. MATTA-LOPEZ, WHO IS A HIGH-RISK PATIENT

### A. Mr. Matta-Lopez qualifies for compassionate release under several BOP Program Statements and under 18 U.S.C. §§ 3582 and 4205(g).

Separate and apart from the COVID-19 outbreak, Mr. Matta-Lopez qualifies for compassionate release under several BOP Program Statements and under 18 U.S.C. §§ 3582 and 4205(g).

#### a. BOP Program Statement 5050.50 § 3b. Debilitated Medical Condition

First, under the "Debilitated Medical Condition" category discussed in Section 3(b) of the BOP's Program Statement, "inmates who have an "incurable, progressive illness" or who have suffered from a "debilitating injury from which they will not

recover" and who are either completely disabled or are confined to a bed or wheelchair for "more than 50 percent of waking hours" qualify for compassionate release under this policy provision.

A review of Mr. Matta-Lopez's Federal Bureau of Prison's medical chart indicates that Mr. Matta-Lopez was diagnosed on February 17, 2017 by Dr. Diane Sommer with chronic obstructive pulmonary disease (COPD). (See Attachment B, pp. 021-024, Clinical Encounter dated 2/17/17.) Due to this condition, Mr. Matta-Lopez becomes winded while walking to the chow hall. Using inhalers have not relieved his symptoms. (See Attachment B, pp. 114-118, Clinical Encounter dated 7/31/17.) The COPD symptoms constantly affect Mr. Matta-Lopez's activities of daily living.

Mr. Matta-Lopez also suffers from congestive heart failure (CHF). A CT scan of his chest found a calcific atherosclerosis in the aorta and coronary arteries (artery buildup), mild cardiomelagy (enlarged heart), and small hiatal hernia. (See Attachment B, pp. 38, Clinical Radiology of Oklahoma dated 8/25/17.) In May of 2018 a non-sustained episode of ventricular tachycardia (fast, abnormal heartbeat) led to hospitalization. (See Attachment B, pp. 63-64, Clinical Encounter dated 5/25/18.) Mr. Matta-Lopez's CHF symptoms cause him to be fatigued daily and limits his activities of daily living. Both his COPD and CHF symptoms will eventually require that Mr. Matta-Lopez use a personal oxygen treatment.

Mr. Matta-Lopez has a history of recurring urinary tract infection that have resulted in sepsis in the past. His prostate-specific antigen (PSA) tests went from 0.9 in October of 2014 to greater than 6.0 in October of 2015. (See Attachment B, pp. 76, Clinical Encounter-Administrative Note dated 10/25/15.) One of the readings at the time found PSA at 7.07 and the urologist recommended laser prostatectomy secondary to total bladder neck obstruction, secondary to prostate hyperplasia. (See Attachment B, pp. 78, Clinic Encounter-Administrative Note dated 10/19/15 and pp. 98, Wayne Memorial Hospital Laboratory Report for USP Canaan dated 10/13/15.)

21

In June 2018, Mr. Matta-Lopez was diagnosed with benign prostatic hyperplasia (BPH) (prostate gland enlargement) with lower urinary tract symptoms and elevated PSA test results. He was scheduled for cystoscopy at that time. (See Attachment B, pp. 57-58, Clinical Encounter dated 6/13/18.) Prior to that diagnosis, Mr. Matta-Lopez was hospitalized with BPH with urinary obstructions from May 15th to the 22nd of 2018. (See Attachment B, pp. 65, Clinical Encounter-Administrative Note date 5/23/18.) He reported being so weak that he urinated himself twice and that all the medications he was on were making him weak. (See Attachment B, pp. 70-71, Clinical Encounter dated 5/15/18.) This procedure was only partially successful, and Mr. Matta-Lopez continues to have to urinate frequently during the night and during the daytime as a result of this issue. He also lives with the constant possibility of again developing sepsis, which can quickly become fatal.

Further, Mr. Matta-Lopez has a history of chronic low back pain with radiculitis. He was first diagnosed with chronic law back pain after lumbar laminectomy in 1981. The doctor recommended trigger point injections at the time. (See Attachment B, pp. 44-46, Orthopedic Consultation dated 2/25/17.) The records also indicate the following:

- Mr. Matta-Lopez complained of constant low back for last 15 days on May 27, 2018 that affected his activities of daily living severely. (See Attachment B, pp. 59-61, Clinical Encounter dated 5/27/18.)
- Mr. Matta-Lopez fell on May 15, 2018 which caused excessive pain to his left side (See Attachment B, pp. 67-69, Clinical Encounter dated 5/15/18).
- An orthopedic consultation showed exacerbation of chronic low back pain and osteoarthritis in both knees, received SI joint injections (See Attachment B, pp. 36-37, Orthopedic Consultation dated 11/4/17.)
- Mr. Matta-Lopez slipped and fell on December 26, 2017 from a computer stool causing increased pain to 10/10 in low back and knee (See Attachment B, pp. 5-6, Clinical Encounter dated 12/29/17.)

22

- Diagnostic imaging showed severe degenerative disc disease at L5-S1, moderate degenerative disc disease at L4-L5, and severe facet arthropathy at L4-S1. (See Attachment B., pp. 34-35, Diagnostic Imaging date12/29/17.)

As a result of his chronic low back pain condition, Mr. Matta-Lopez must use a back brace during waking hours, and past treatment which include physical therapy, epidural steroid injections and non-steroidal anti-inflammatory medications have been unsuccessful at relieving his chronic pain.

Mr. Matta-Lopez also suffers from bilateral foot calcaneal spurs, chronic osteoarthritis of his left knee with arthrosis despite a total knee replacement. Dr. Luigi Gallioni conducted Mr. Matta-Lopez's total left knee surgery on September 19, 2018. (See Attachment B, pp. 47-48, Clinical Encounter dated 11/29/18.) [Originally scheduled for July of 2018, but rescheduled due to security breach in prison. (See Attachment B, pp. 54, Clinical Encounter-Administrative Note dated 8/14/18.)] Prior to the total left knee replacement, the records also indicate the following:

- Mr. Matta-Lopez treated for a slip and fall off his bed on August 19, 2018 which severely increased his right knee pain (also pain in right side of head and right elbow) (See Attachment B, pp. 52-53, Clinical Encounter dated 8/19/18.)

- Mr. Matta-Lopez hit his left knee in the shower on March 23, 2017 which increased his pain (See Attachment B, pp. 11-13, Clinical Encounter dated 5/8/17.)

- Mr. Matta-Lopez received weekly Synvisc injections into both knees from February 24, 2017 through March 20, 2017 (See Attachment B, Clinical Encounter dated 9/29/17 (pp. 8-10), 3/20/17 (pp. 16-18), 3/3/17 (pp. 14-15) and 2/24/17 (pp. 19-20).)

- Orthopedic doctor found that Mr. Matta-Lopez's knees were in such bad condition that he is a constant fall risk. (See Attachment B, pp. 44-46, Orthopedic Consultation dated 2/25/17.)

23

- Mr. Matta-Lopez complained of severe pain in both knees and requested getting both replaced in 2015 (See Attachment B, pp. 79-84, Clinical Encounter dated 9/24/15.)

Mr. Matta-Lopez's current low back pain and knee pain conditions will require the need of the continued use of a cane/walker to assist with ambulation and require the transition to a full-time need of a wheelchair. He was given a wheelchair for a short period of time but it was taken away from him.

Mr. Matta-Lopez has also been diagnosed with senile macular degeneration, a condition that is a leading cause of irreversible blindness. Once blind, Mr. Matta-Lopez will require full-time assistance with activities of daily living.

Mr. Matta-Lopez also suffers from a serious cognitive impairment and worsening mental health. Dr. Mowatt diagnosed Mr. Matta-Lopez on January 7, 2019 with delusional disorder due to advanced aging/sundowning, a.k.a. delirium. (See attached Bureau of Prisons-Health Problems report dated October 24, 2019.) A CT scan of his brain conducted on March 9, 2017 showed calcification of the anterior left frontal lobe representing meningioma (tumor in the brain) (See attached Clinical Radiology of Oklahoma.)

Currently, Mr. Matta-Lopez's activities of daily living are very limited and have become a burden for both him and Canaan's staff. He constantly complains about numbness in his hands and the cold temperatures in his cell and the effects the weather has on his arthritic condition. He is unable to sleep because of the cold and his hourly need to urinate. Due to chronic obstructive pulmonary disease and congestive heart failure, he is fatigued daily just by short routine walks to and from his cell and the dining area. He is confined to using a walker to ambulate because he suffers from lower back pain and knee pain. He was confined to a wheelchair in the most recent past, however, Canaan staff switched him to a walker because the wheelchair is too big and hard to maneuver within the facility.

### b.  Program Statement 5050.50 § 4b. Elderly Inmates with Medical Conditions

Mr. Matta-Lopez also qualifies for compassionate release under the "Elderly inmates with a Medical Conditions" category as discussed in Section 4(b) of the Program Statement. According to this program statement, the inmate must be 65 or older, suffer from a "chronic or serious medical condition related to the aging process," "[e]xperienc[e] deteriorating mental or physical health that substantially diminishes their ability to function" in a prison, and have served 50 percent or more of their sentence of incarceration in order to qualify for compassionate release under this policy provision.

The U.S. Sentencing Guidelines describes the compassionate release of elderly prisoners with medical conditions differs from the Bureau's policy in a few of ways. The U.S. Sentencing Commission requires only that an inmate has served 10 years or 75 percent of his or her sentence, whichever is less. [U.S.S.G. § 1B1.13, comment. (n. 1(B)).] The Guideline also specifically eliminates any inquiry into whether the condition existed or was apparent at the time of offense or sentencing. [U.S.S.G. § 1B1.13, comment. (n. 2).]

Mr. Matta-Lopez is currently 75 years old and has served more than half his sentence. As stated above, he suffers from advanced age sundowning, a.k.a. delirium, which is representative of the early stages of dementia. This is a medical condition related to the aging process which is both incurable and progressively diminishes his ability to function.

### c.  Program Statement 5050.50 § 4a. "New Law" Elderly Inmates

Mr. Matta-Lopez's petition is also made under the "New Law" Elderly Inmate category as discussed in Section 4(a) of the Program Statement. According to this program statement, inmates who were sentenced after November 1, 1987, who are 70 years old or older, and who have served 30 years or more qualify for compassionate release under this policy provision.

As stated above, Mr. Matta-Lopez was sentenced to life in prison in 1990 and 1991 and has been in prison for well over 30 years of his prison sentences and he is 75 years of age. Under the "New Law" for elderly inmates, Mr. Matta-Lopez qualifies for compassionate release under this provision.

**B. The conditions of BOP incarceration foster the spread of COVID-19, and Mr. Matta-Lopez's age and preexisting conditions render him particularly susceptible to an unreasonable risk of death and an inability to take preventative measures or self-care recommended by the CDC.**

As of April 1, 2020, COVID-19 has infected over one million people worldwide, leading to at least 54,497 deaths.[13] In the United States, approximately 258,600 have been infected, leading to 6,660 deaths.[14] The BOP COVID-19 page currently lists 75 inmates and 39 staff members who have tested positive. These numbers almost certainly underrepresent the true scope of the crisis; test kits in the United States have been inadequate to meet demand. As discussed above, many courts have found this circumstance to be dispositive.

The Centers for Disease Control and Prevention ("CDC") have issued guidance related to the deadly effects of COVID-19 on certain high-risk patients of the population such as Mr. Matta-Lopez.[15] For these individuals, the CDC warned to take immediate preventative actions, including avoiding crowded areas and staying at home as much as possible.

---

[13] "Coronavirus Map: Tracking the Global Outbreak," *New York Times* (March 25, 2020), available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html?action=click&pgtype=Article&state=default&module=styln-coronavirus&variant=show&region=TOP_BANNER&context=storyline_menu?action=click&pgtype=Article&state=default&module=styln-coronavirus&variant=show&region=TOP_BANNER&context=storyline_menu.

[14] *Id.*

[15] "People At Risk for Serious Illness from COVID-19," CDC (March 12, 2020), available at https://bit.y/2vgUt1P.

26

It is only a matter of time before COVID-19 finds its way into USP Canaan, where Mr. Matta-Lopez is housed. Conditions of confinement in BOP facilities create an optimal environment for the transmission of contagious disease.[16] People who work in the facility leave and return daily; people deliver supplies to the facility daily; inmates were having social, legal and medical visits regularly after the initial spread of the virus prior to the BOP's decision to stop visits for 30 days on March 13, 2020.[17] Public health experts are unanimous in their opinion that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," and "infection control is challenging in these settings."[18]

Mr. Matta-Lopez is powerless to take the preventative self-care measures directed by the CDC for his high-risk group to remain safe from COVID-19 infection. He cannot self-quarantine or partake in "social distancing" in his prison facility. He is housed in a community environment with community spaces where inmates and prison staff gather. These high-density areas are precisely the kind of spaces that have caused the alarmingly high-spread rates of COVID-19.[19] Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its

---

[16] Joseph A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases* 45(8): 1047-1055 (2007), available at https://doi.org/10.1086/521910.

[17] "Federal Bureau of Prisons Covid-19 Action Plan," available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.

[18] "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), at https://bit.ly/2W9V6oS.

[19] "White House Tells Travelers from New York to Isolate as City Cases Soar," *New York Times* (March 24, 2020), available at https://www.nytimes.com/2020/03/24/nyregion/coronavirus-new-york-update.html.

alcohol content.[20] Correctional health experts worry that no matter what precautions are taken by crowded prisons, these facilities may become incubators for the COVID-19 disease.[21]

During the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases because they could not maintain the level of separation and sanitation necessary to prevent widespread infection.[22] The Prison Policy Initiative has called on American jails and prisons to release medically fragile and older adults, noting that these persons are at high risk for serious complications and even death from COVID-19.[23] Similarly, members of Congress have written to the BOP to urge that efforts be made to allow immediate release of non-violent, elderly inmates.[24]

Given that Mr. Matta-Lopez suffers from significant underlying health issues that make him exceptionally vulnerable to COVID-19, compelling and extraordinary circumstances exist to support compassionate release at this unique time in our country's

---

[20] Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Coronavirus When Purell is Contraband?," *ABA Journal* (March 13, 2020), available at https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[21] Michael Kaste, "Prisons and Jails Worry About Becoming Coronavirus 'Incubators'," *NPR* (March 13, 2020), available at https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[22] "Prisons and Jails are Vulnerable to COVID-19 Outbreaks," *The Verge* (Mar. 7, 2020), available at https://bit.ly/2TNcNZY.

[23] Peter Wagner & Emily Widra, "No Need to Wait For Pandemics: The Public Health Case for Criminal Justice Reform," *Prison Policy Initiative* (March 6, 2020), available at https://www.prisonpolicy.org/blog/2020/03/06/pandemic.

[24] Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

history. There is an urgent need to act now, before the virus spreads within the prison and Mr. Matta-Lopez becomes infected.

## IV.   THE RELEVANT § 3553(a) FACTORS, INCLUDING MR. MATTA-LOPEZ'S RELEASE PLAN, FAVOR RESENTENCING

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in §3553(a) to determine whether a sentencing reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). In this case, a review of the Section 3553(a) factors, and his release plan of returning to Honduras to live with his family, favor granting Mr. Matta-Lopez's compassionate release.

First, while Mr. Matta-Lopez's convictions are serious, they do not involve violence. Mr. Matta-Lopez was convicted in each of the two cases for which he is now serving time of organizing the distribution of large amounts of cocaine in the 1980's. Mr. Matta-Lopez was sentenced to life sentences in each case on the counts alleging organization of a Continuing Criminal Enterprise. These sentences were imposed, however, at a time when Mr. Matta-Lopez was under the cloud of criminal charges alleging involvement in the kidnapping and murder of a DEA agent, Enrique "Ki Ki" Camarena in 1985, for which he was convicted before one of the sentences was imposed. This kidnapping conviction has subsequently been vacated by habeas petition and then ultimately all charges were dismissed by government motion.[25]The overturning of this conviction and dismissal of the indictment came about after the government revealed that the primary evidence against Mr. Matta-Lopez at trial, the testimony of a government forensic expert which established the only real link of Mr. Matta-Lopez to the crime, had been fabricated by the expert. [26] The dismissal did not take place until December of 2018, almost 30 years after his conviction, during which time the conviction had seriously

---

[25] See *United States v. Caro-Quintero*, 2:87cr0422-JAK-17 Doc. No. 4416. Mr. Matta-Lopez was acquitted of the murder charge at trial.

[26] *Id.*, Doc. No. 4183.

impacted Mr. Matta-Lopez's security level and thus his conditions of confinement. For much of those 30 years Mr. Matta-Lopez was incarcerated in the ADX Supermax facility in Colorado in solitary confinement, based on his erroneous conviction in the kidnapping case.

There can be no real doubt that the Camarena allegations not only impacted how the U.S. government handled Mr. Matta-Lopez's arrest, which was essentially an armed abduction, but also his likelihood of a fair trial and his subsequent sentences in the cases at issue here. After Mr. Matta-Lopez was forcibly taken from his home in front of his family, he was taken directly to the airport and put on a flight with American officials. A number of hours later he arrived at USP Marion. Upon his arrival in federal custody Mr. Matta-Lopez complained that he had been abducted and tortured and the photographs taken at Marion appear to support his complaints. He was also seen that same day, by R. Uranik, Ph.D, Chief Psychologist, USP-Marion IL. In the concluding paragraph of his report, Dr. Uranik stated:

> MATA has been on Escape status since 9 /25/71. He is serving a three year sentence for Forging a Passport and Illegal Entry. *There are indications that he shortly will be charged in the murder of a DEA agent and with many associated drug counts.* There has been a great deal of national press coverage surrounding him in the last few hours. Other history is from the inmate. [Emphasis added]

As indicated by this excerpt, Mr. Matta-Lopez's abduction and arrest on April 6, 1988 was widely televised, and the allegations of his connection to the the kidnapping and murder of DEA agent Enrique Camarena were also well known as early as that date. These allegations, which have since proven meritless, unavoidably impacted everything that happened to Mr. Matta-Lopez after his arrest in 1988, including his sentences in these cases, and he has been in continuous federal custody since that time. Given the 32 years he has spent in custody, much of it in solitary confinement, his immediate release would not create any disparity between the seriousness of his

30

offenses and the punishment that has already been imposed upon him, nor would such an outcome undermine respect for the law. Mr. Matta-Lopez was forcibly taken from his home and family long ago, and has lost contact with his social and professional relations outside of his family in the decades that have followed. These decades of prison have left him unable to walk, almost blind, and wracked by constant pain, infection, incontinence, and extreme cognitive decline.[27] And now these ailments and years make him extremely susceptible to death by viral infection. Mr. Matta-Lopez has paid dearly for his crimes, and is no longer a danger to society, whether in this country or in the land of his birth.

Furthermore, Mr. Matta-Lopez has a wife and three adult children waiting to care and provide for him upon his release from BOP custody. His two daughters, Maria Isabel Matta-Vasquez and Claudia Matta both live in Tegucigalpa, Honduras and have already consulted with a medical doctor who has agreed to provide medical assistance to Mr. Matta-Lopez upon his return to Honduras. Both daughters indicate that Mr. Matta-Lopez will be able to reside with them after he is released. Mr. Matta-Lopez will therefore no longer be a burden to the United States government, and will be provided for by his family in Honduras for what remains of his life.

Under these circumstances, the law fully supports Mr. Matta-Lopez's immediate release. Congress's expansion of the compassionate release statute by § 603(b) of the First Step Act reflects congressional intent for courts to have greater flexibility to reduce sentences when compelling circumstances justify a later review. The title of the amendment, "Increasing the Use and Transparency of Compassionate Release," accentuates that intent. The evolving case law also demonstrates that courts have construed their discretion generously to effectuate Congressional desire to increase the use of the compassionate release statute encouraged by this amendment. Significantly, courts weighing § 3553(a) factors have granted release to defendants with convictions

---

[27] *See* attached exhibits and additional medical exhibits to be filed under seal.

for serious crimes and with histories of violence, finding that changed health circumstances, aging defendants, post-offense rehabilitation, and carefully crafted conditions of supervised release ameliorate public safety concerns.

In *United States v. Bailey,* for example, the defendant was sentenced to 30 years for "an extensive racketeering scheme," including a specific finding that the defendant committed offenses relating to a murder. *Bailey,* No. 94-cr-481 (N.D. Ill. July 24, 2019) (slip op. at 1). The parties agreed that the defendant, who was almost 90 years old and suffered from multiple health issues, had satisfied the statutory requirements for compassionate release. However, the government opposed release under the Section 3553(a) factors due to the "reprehensible nature of the offense." The court acknowledged that the defendant's criminal history and serious offense conduct supported a denial of the requested reduced sentence. But the court weighed the more recent factors in the defendant's favor, including his institutional adjustment, lack of disciplinary infractions, his advanced age, and his release plan, and concluded that they "point in the opposite direction[ ]." *Id.* In weighing these more recent favorable factors over the defendant's past criminal history, the court granted the reduced sentencing request, concluding that release at this stage of the defendant's life would not minimize the severity of the offense and the defendant no longer posed any credible threat to the public. *Id.* at 2.

In a District of Oregon case, the court likewise granted compassionate release to a defendant, who also was serving a 30-year sentence for leading a "major drug conspiracy." *United States v. Spears*, No. 3:98-Cr.-208-SI-22, 2019 WL 5190877, at *4 (D. Or. Oct. 15, 2019). As explained in the court's opinion granting release, the defendant's history included crimes of violence, his performance on supervised release had been poor, and he committed the last serious offense for which he was serving imprisonment when he was in his fifties. *Id.* at *4. Despite these findings, the district court found that the defendant was now 76 years old and suffered from "multiple chronic serious medical conditions and limited life expectancy." *Id.* at *1. Although the government persisted that the defendant remained dangerous, the Court disagreed. The

32

Court concluded that, in light of the defendant's strong family support, the age of his prior convictions, and his diminished physical condition, "appropriate supervision conditions can mitigate any limited risk" to public safety and provide sufficient specific deterrence. *Id.* at *5.

Similarly, in *United States v. McGraw,* No. 02 Cr. 18 (LJM-CMM), 2019 WL 2059488 (S.D. Ind. May 9, 2019), the court granted compassionate release from the defendant's life sentence for a drug trafficking conspiracy based on the defendant's serious health concerns and diminished ability to provide self-care under commentary note 1(A)(ii) of U.S.S.G. § 1B1.13. The defendant, who was approximately 55 years old at the time of the offense, was 72 years old at the time of the court's release opinion and suffered from limited mobility, diabetes, and chronic kidney disease. *Id.* at *2. The government argued that the defendant remained a danger to the community because of his leadership in a notorious motorcycle gang, noting that he could continue his criminal activity with simple access to a telephone. *Id.* at *4. The court, however, concluded that given the defendant's frail health, his positive record at the institution, and the ability of the court to impose conditions that would reasonable assure the safety of the community upon release, the more flexible compassionate release statute, as amended by the First Step Act, favored granting the defendant's motion. *Id.* With respect to the Section 3553(a) factors, the court concluded that the "significant sanction" the defendant had already served was sufficient:

> But further incarceration is not needed to deter Mr. McGraw from further offenses; nor for reasons described above, is it necessary to protect the public from future crimes. Finally, Mr. McGraw has served much of his sentence while seriously ill and in physical discomfort. This means that his sentence has been significantly more laborious than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2).

33

1   *Id.* at \*5. The court imposed lifetime supervision to "continue to serve as a sanction and

2   general deterrent, appropriately recognizing the seriousness of Mr. McGraw's

3   conduct." *Id.* at \*4.

4         In addition to these cases and the compassionate release grants cited above, in the

5   few days, numerous courts have granted compassionate release motions for inmates

6   like Mr. Matta-Lopez who suffer from serious medical issues. See, e.g. *United States v.*

7   *Edwards*, No. 6:17-cr-3-NKM, Dkt. No. 134 (Apr. 2, 2020) (granting compassionate

8   release; "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18

9   months of his term in federal prison would expose him to a heightened and substantial

10   risk presented by the COVID-19 pandemic on account of Defendant's compromised

11   immune system, the Court would not have sentenced him to the latter 18

12   months"); *United States v. Hernandez*, No. 18-cr-20474, Dkt. No. 41 (S.D. Fla. Apr. 2,

13   2020) (granting unopposed motion for compassionate release for defendant with cancer

14   & immunosuppression and just under 12 months left to serve on 39 month

15   sentence); *United States v. Perez*, No. 1:17-cr-513-AT, Dkt. No. 98 (S.D.N.Y. Apr. 1,

16   2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in

17   prison for the remainder of his sentence are minimal, and the potential consequences of

18   doing so are extraordinarily grave"); *United States v. Rodriguez*, No. 2:03-cr-271-AB,

19   Dkt. No. 135 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for

20   COVID-19 constitute extraordinary and compelling reason and noting that prisons are

21   "tinderboxes for infectious disease"); *United States v. Williams*, No. 3:04-cr-95-MCR-

22   CJK, Dkt. No. 91 (Apr. 1, 2020) (compassionate release in light of severe risk posed to

23   defendant by COVID-19); *United States v. Gonzalez*, No. 2:18-cr-232-TOR, Dkt. No.

24   834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month

25   sentence in light of medical issues; ordinarily these conditions would be manageable

26   but "these are not ordinary times").

27         The district court wrote these words in *Rodriguez*:

28

34

> For Mr. Rodriguez, nothing could be more extraordinary and compelling than this pandemic. Early research shows that diabetes patients, like Mr. Rodriguez, have mortality rates that are more than twice as high as overall mortality rates. One recent report revealed: "Among 784 patients with diabetes, half were hospitalized, including 148 (18.8%) in intensive care. That compares with 2.2% of those with no underlying conditions needing ICU treatment."

> These statistics – which focus on the non-prison population – become even more concerning when considered in the prison context. Prisons are tinderboxes for infectious disease. The question whether the government can protect inmates from COVID-19 is being answered every day, as outbreaks appear in new facilities.

*Rodriguez* at *2 (internal citations omitted). Mr. Matta-Lopez, who is at extraordinary risk given his age, lung condition, and the respiratory nature of COVID-19, has an even more compelling case for release. As amplified above, releasing him under the current extraordinary and compelling circumstances of the threat of a novel contagion contaminating the prison would not serve to diminish the seriousness of the offense of conviction, but would fulfill Congress's intent in offering courts greater flexibility to reduce sentences when changed circumstances justify a later review. Mr. Matta-Lopez's pre-existing health conditions, his age, and the rapidly advancing COVID-19 outbreak, together with the prison's inflexibility to give Mr. Matta-Lopez the ability to take self-care measures directed by the CDC to remain safe during the outbreak, warrant his release.

## V.    CONCLUSION

For the foregoing reasons, Mr. Matta-Lopez respectfully requests that the Court grant his motion for compassionate release.

Respectfully submitted,

DATED: April 3, 2020

By */s/ Mark Windsor*
MARK WINDSOR, for
JUAN MATTA-LOPEZ